## ENGLES *v.* SHAFFER.

### Opinion delivered March 15, 1920.

1. CORPORATIONS — ADVANCES BY STOCKHOLDER — CONTRIBUTION.— Where the active stockholder and officer in the management of a corporation's business advanced money to carry out its object, with the knowledge and acquiescence of the other stockholders, they will be liable for their proportion of such advances.

2. CORPORATIONS—AUTHORITY OF DIRECTORS LESS THAN QUORUM.— Where, in response to notice of a meeting of corporate directors, a quorum was not present, but the directors who attended constituted themselves an auditing committee and determined what was due plaintiff, their finding and report can not be treated as an account stated.

3. CORPORATIONS — CONTRIBUTION AMONG STOCKHOLDERS — JURISDICTION.—A court of equity is the appropriate forum to enforce the right of a stockholder who has paid debts of the corporation against the other stockholders where the corporation is insolvent.

Appeal from Sebastian Chancery Court, Fort Smith District; *J. V. Bourland,* Chancellor; reversed.

*Vincent M. Miles,* for appellant.

1. Appellant has pursued the proper remedy. A committee was appointed to audit appellant's account. The committee did so and reported to the company. This was an account stated and fixed the liability of the company. 47 Ark. 541; 80 *Id.* 472. The company was insolvent and had ceased its functions. Equity was the appiate forum. 110 Ark. 39; 17 Ohio 187; 16 Conn. 593; 56 Ga. 191; 101 U. S. 205.

2. Appellee can not set-off against appellant the entirety of his unpaid stock subscribtion. He has deducted his proportion of the money spent by him, and they are liable to him for their proportion. 62 Cal. 448; 95 *Id.* 581; 27 Pac. 674; 30 *Id.* 776; 59 *Id.* 319; 126 Cal. 72.

2. The only question is, how far plaintiff's rights of recovery is affected by the fact that he himself is a stockholder in the coporation and indebted for unpaid subscriptions? While the corporation is a party defendant, it is not an indispensible party. 95 Cal. 578; 30 Pac. 777. A creditor of a corporation who is himself a stockholder and liable for unpaid subscriptions may without fully paying his own subscription maintain the action against other delinquent stockholders to enforce payment of a judgment obtained by him against the corporation. 15 Fed. 353; 35 Pac. 488; 9 Utah 397. It is not necessary to join all the stockholders. 101 U. S. 205. As to the rule, see 127 Cal. 72; 59 Pac. 319; 89 Pac. 1090; 95 Ark. 124; 97 *Id.* 522. Where appellant completed the well with his own money the other stockholders were liable for their *pro rata* part. 214 S. W. 53; 56 Ark. 382; 19 S. W. 945.

3. The contract of subcription to stock can not be varied. 97 Ark. 249; 20 *Id.* 443; 10 Cyc. 413-15; 26 A. & E. Enc. Law 911; 1 Cook on Corp., § 81; 2 Beach on Priv. Corp., § 531; 92 Ark. 505.

4. Patterson was liable. 94 Ark. 499; 97 *Id.* 748.

*Evans & Evans,* for appellees, Patterson.

The overwhelming preponderance of the evidence establishes the truth of Patterson's separate defense in this case and appellant is estopped as against Patterson. 131 Ark. 82; 31 *Id.* 684; 9 *Id.* 389; 15 *Id.* 359; 93 *Id.* 214; 120 S. W. 755; 110 *Id.* 382. The decree of the chancellor is corect.

*I. H. Nakdimen* and *J. B. McDonough,* for appellees and *pro sese.*

There is no equity in this bill, and it was properly dismissed. The decree is supported by the evidence. 71 Ark. 1; 785 S. W. 258; 102 Ark. 51; 91 *Id.* 268; 122 *Id.* 235; 1 Crawford's Dig., 308-9; 192 S. W. 906; 99 Ark. 350.

SMITH, J. This is a suit against appellees to compel them to pay their proportionate part of the sum alleged to be due appellant by the Oklahoma Oil & Gas Company, hereafter referred to as the company. The theory of the case is that the company is indebted to appellant, and that appellees are liable as stockholders in the company on unpaid subscriptions for stock. The court below found the cause was without equity, and dismissed it on that account. The basis of this finding was that appellant had, without authority, either express or implied, on the part of the company, expended the money for which he sues. The decree also recites that the sum claimed is exorbitant, even though liability existed for reasonable expenditures. As to appellee Patterson the court found that, as between appellant and Patterson, an agreement existed whereby appellant was to pay all calls made against Patterson's stock.

We have concluded that, except as to Patterson, the finding of the court is against the preponderance of the evidence, and as the question involved on this appeal is this question of fact we set out so much of the testimony as leads us to the conclusion stated.

Seven men, to-wit, appellant Frank Engles, and T. J. Burns, F. E. Adams, H. C. Miller, Arthur Lawrence, G. O. Patterson, and J. J. Cravens, associated themselves together for the purpose of drilling for oil and gas near Scranton, in Logan County, Arkansas, and on March 14, 1916, entered into a contract with one J. L. Davis to drill their well.

In this contract it was provided that Davis should drill a well 3,000 feet deep ''unless oil and gas is found in paying quantities before this depth is reached. The parties of the first part agree to lease to the party of the second part (Davis) 5,000 acres, and pay freight on his drilling outfit from Sapulpa to said well, and to furnish standard rig, and to pay standard wages to drillers and tool-dressers, also Davis' board while overseeing the drilling of said well, and to furnish water and fuel at the well.''

At the time this contract was executed the parties intended to incorporate, and that intention was consummated on May 16, 1916, when a charter issued to the above named persons as incorporators by the Secretary of State of the State of Arkansas. The corporate name assumed was Oklahoma Oil & Gas Company. Its domicile was Clarksville, Arkansas, and its authorized capital was $50,000. Prior to the consummation of the incorporation negotiations had been pending between these incorporators and appellees Nakdimen, McDonough and McGehee to become interested in the project. The three gentlemen last named were acquainted with the original incorporators except three of them who lived in Sapulpa, Oklahoma, and at Nakdimen's suggestion McDonough went to Sapulpa and investigated their standing. The investigation proved satisfactory, and a contract was then made between the incorporators of the company and these three gentlemen, all of whose names are recited as being parties to the contract, but McGehee, for some reason not explained, did not sign it. This contract was dated May 13, 1916, and much stress is laid upon it by appellees, as they say it explains their relationship to the company and defines the conditions under which they can be held liable for any of its obligations. Objection to the introduction of this writing, or consideration of it, is made by appellant upon the ground that it is inadmissible if it tends to vary the terms of the stock subscription. Appellees Nakdimen, McDonough and McGehee insist that this writing absolutely limits their liability to $500, and that any sum in excess of that amount paid by them was paid voluntarily.

The relevant portions of this contract are as follows: ''In consideration of the mutual undertakings and agreements herein, it is agreed that each of the parties above named shall be entitled to a one-tenth interest in all of the holdings of the Oklahoma Oil & Gas Company in leases in Logan and Johnson counties, in the State of Arkansas, by reason of ownership in the stock of said corporation.

"It is expressly agreed that each be taken and considered as one of the original subscribers of said stock of said corporation, and each shall have a one-tenth interest the same as though they had subscribed to the articles of incorporation at the organization of said company, and stock shall be issued to each in the same way that stock shall be issued to each of the original seven who incorporated the said Oklahoma Oil & Gas Company.

"In the consideration of the premises, the said parties above named each agrees to pay to the Oklahoma Oil & Gas Company the sum of $500, the said amount being the same amount that each of the original seven organizers in said corporation agreed to pay to said Oklahoma Oil & Gas Company, and upon demand of the said company.

"It is further expressly agreed that the parties above named become stockholders in said Oklahoma Oil & Gas Company, and are liable as stockholders to the extent that each of the other original seven is liable as stockholders, and each is responsible for one-tenth of all the expense of said Oklahoma Oil & Gas Company up to the time of the organization of the corporation, and is thereby liable thereafter as stockholders in the same manner as the original seven are liable as stockholders. The liability of each of said parties as partners in the organization of said company ends at the organization of said company, and their liability thereafter is as stockholders.

"The amount of stock to be issued to each of the parties above named shall be the amount that is issued to each of the original seven stockholders above named."

Other portions of the contract deal with the marketing of the gas, if gas be found, and concludes with the statement that these three new parties "will do all in their power to properly finance the marketing of said gas, undertaking no greater or higher liability therefor than any other stockholder in said company."

We think a fair construction of this contract is that it was intended that the three new stockholders should come in on the "ground floor," as was expressed by Mc-

Donough in a contemporaneous letter to appellant, about coming in and that their rights and obligations should be identical with those of the original incorporators, and that the statements in regard to the $500 were not intended to fix the maximum assessments on account of stock which might be made against them, but was fixed as a sum to be immediately paid by them to become stockholders at all.

Unfortunately the company's minute book was lost, and uncertainty exists about the proceedings had at certain meetings on that account. There is no reason to believe that any one destroyed it to suppress the evidence it contained; but it appears certain that appellant was not responsible for its loss. Appellant was the president of the company, and Patterson the secretary, and the book was left by Patterson with Nakdimen to have his stenographer write up the minutes of a particular meeting. The recollection of the witnesses differs as to who thereafter had the book, and no one appears to know what really became of it.

In addition to the alleged lack of authority on appellant's part, which is the difficult question in the case, to expend the money for which he seeks to charge the company, it is alleged by certain of the appellees that they were induced to become stockholders by reason of certain fraudulent representations made by appellant. These representations were that the well would not cost exceeding $5,000, and that Davis was a responsible driller, when he was not, in fact, responsible. In answer to these preliminary defenses, it may be said that any statements made by appellant about the cost of the well (and he denies making any) were nothing more than expressions of opinion, and were not made with any fraudulent purposes, nor, for that matter, were they made to induce appellees to subscribe for stock. As to the responsibility for Davis, it may be said that, notwithstanding his misconduct in drilling the well in question, the undisputed testimony shows that prior thereto he had been regarded as a successful and responsible driller.

Before making the contract set out above, appellant and appellee Patterson were engaged in obtaining leases, all of which were taken in the name of the company, and they had obtained leases on something over 11,500 acres of land.

The separate defense of Patterson grows out of these transactions. Patterson testified that, in consideration of his services in obtaining these leases, the charter for the company, and other professional services, appellant was to pay any assessment made against Patterson's stock. Appellant admits the value of Patterson's services, and says the understanding was that the company should pay a fee of $500 for them, and that it is unreasonable to assert that he had personally assumed an obligation which inured to the benefit of the company rather than to himself individually, as he owned only one-tenth of the corporate stock, as each of the original incorporators, together with the three new members, owned a tenth of the stock. However, without protracting this opinion by setting out the evidence on this branch of the case, it suffices to say that Patterson's version of this transaction, however unreasonable it might otherwise appear, is corroborated to the extent that we cannot say that the chancellor's finding thereon is contrary to the preponderance of the evidence.

It appears that Engles furnished the money that was paid for these leases, and that from the begnning he became the active stockholder and officer in the management of the company's business, and his testimony shows that, in taking leases, getting out timber for the derrick, building the derrick, hiring cars and livery rigs for men to take leases, he had spent $4,800 by the time the derrick was up. It appears, therefore, that before any drilling whatever was begun Engles had expended $4,800.

Notwithstanding the domicile of the corporation was Clarksville, Arkansas, it appears that all the meetings were held in Fort Smith, the usual meeting place being McDonough's law office, the directors' room of Nakdimen's bank, or the Hotel Main, and at one of the meet-

ings in May a resolution was passed that no contract should be made in the name of the company, or obligation incurred against it, except by authority of the board of directors. The purpose of this resolution does not appear to have been to question any indebtedness then due Engles.

Various troubles developed at the well. Davis proved inattentive, and his work became very expensive. A replevin suit was brought involving the title to his tools, which the company was required to defend to prevent a suspension of operations, and certain of the stockholders who became sureties for the company on a bond executed in that litigation were required to pay a thousand dollars, with costs of litigation. McDonough represented the company in this, and other, litigation, and filed a cross-bill against Engles for these fees. He asked no judgment, however, on that account in the court below, if no judgment against him was rendered, and as the court found in his favor on the complaint, no judgment was rendered on the cross-complaint.

The drilling commenced the last of May or the first of June, and various troubles developed. The company became involved in other litigation, and after going a considerable depth the drilling tools dropped in the well, and they lost 1,400 feet of casing because of a split in some of it. In addition to the original 10 per cent. assessment, two other assessments were made, one for 5 per cent., and the other for about 2½ per cent., of the stock owned by each stockholder, and it appears that this call was responded to by all the stockholders except Patterson, who, for reasons above stated, had never paid the first assessment. Nakdimen was the treasurer, and wrote the stockholders for these assessments, and in one of these letters under date of July 14, 1916, explained that the pipe alone was costing over $2,100.

Finally Davis' work proved so unsatisfactory that he was discharged. The well was then uncompleted. They had not reached the depth at which they expected to find oil or gas, and the question which naturally pre-

sented itself to the promoters of the enterprise was whether they should lose what they had already spent or should proceed with the work. A general meeting was called, not only of the directors, but of the stockholders. Patterson, as secretary, prepared notices of this meeting, and Engles mailed them out. This meeting was called for September 21st, and, notwithstanding its importance, it appears to have been very informal. Witnesses testify that McDonough was present; but it is conclusively shown that he was not present, as he was out of the State at the time. The minutes of this meeting were not prepared at the time, although Engles insisted that they be written up, and they were written up by Patterson at a later date in a notebook belonging to Engles.

It appears that no formal resolution was introduced or passed at this meeting; but Patterson testified that there was a general discussion of the company's prospects and an agreement reached, without dissent, that Engles proceed to the completion of the well, and that he wrote up in the form of a resolution what he regarded as the decision of the meeting. That resolution reads as follows: "On motion, adopted by unanimous consent, Frank Engles was directed to take charge of the drilling operations, to go to the drill and remain until well is completed, except on Sundays, and to settle all accounts for labor and other accounts, and to present his accounts when well is completed, and an assessment will be made by draft upon each stockholder for his proportionate part of whatever may be necessary to fully pay off and discharge all the company's obligations."

The record of this meeting as written up also recited that the president and secretary were authorized to execute to Newell Menifee a power of attorney authorizing him to transfer and assign on the part of the company leases set apart to Davis, and to apply the proceeds in each instance to payment of Oklahoma Iron Works on account for drill, that company having recovered judg-

ment against Davis in litigation to enforce a lien claimed by it on tools used by Davis in drilling the well.

Patterson explained that this resolution was in line with the previous action at a meeting of the board of directors, and he supposed there would be no objection to it, notwithstanding its informality.

It is insisted that this was not a legal meeting and did not bind the corporation, and that no implied obligation could arise out of it, because it had been decided at the May meeting that only the directors should have the right to make contracts for the company, and that on July 3rd McDonough had written a letter to Nakdimen, a copy of which was sent all other stockholders, in which he stated his understanding with certain stockholders that the president should not have power to make contracts, and that he was not willing to be responsible under unauthorized contracts. It is insisted that no dissent was ever expressed to this letter, and that it should be taken as imposing an additional limitation on the president's power. In this letter McDonough stated, however, that he was willing to put up any reasonable amount in the bank to proceed with the well, but he was not willing to do so unless it was first agreed upon.

It appears to us that this meeting of September 21st was a legal meeting of the directors of the company; and, if it was, the authority there conferred on appellant is not to be impaired because proper minutes thereof were not written up, and the action at that meeting rescinded any previous limitation which had been imposed upon appellant, so far as proceeding with the drilling of the well was concerned. Proper notice appears to have been given, and it is shown that the meeting was attended by Frank Engles, Fred Adams, Arthur Lawrence, G. O. Patterson, and George Shaffer. As we understand it, those present constituted a majority of the board of directors. On account of the loss of the company's record book it is not clear who the directors then were. But appellees say in their brief that "the directors, according to the recital on page 66 of the transcript, were Frank Engles,

appellant, J. J. Cravens, H. C. Miller, Arthur Lawrence, F. E. Adams, T. J. Burns, and G. O. Patterson. There is not a syllable of legal evidence in the case to show that the directorship was ever changed. If this is true, a quorum was present, and a legal meeting was held.

Burns and Lawrence testified that at a directors' meeting attended by them Engles was authorized to complete the well, and that Engles reported progress at various meetings. Patterson and appellant gave testimony to the same effect. Nakdimen testified about the adoption of the resolution denying Engles authority to bind the company except upon the action of the board of directors; but admitted that at one meeting Engles was authorized to stay at the well and see that the work was done.

Whether the meeting of September 21st was a legal meeting or not we think there was at least implied authority on Engles' part to proceed with his drilling at the well. Davis ceased work July 5th, and thereafter until the well was completed in November all the stockholders knew that Engles was in charge of the well and was proceeding with the work on it. Patterson testified that all parties knew Engles was drilling the well, and that he was doing so under the supposed direction of the company, and that while the work was proceeding he discussed the matter with about all the parties in interest. Appellee Shaffer testified that he did not recall attending any meeting at which Engles was authorized to proceed, but that he did remember that Engles was directed to give attention to the well. McDonough testified that he knew Engles was placed at the well, but that he was there under the agreement that he was not to make any contract, or buy anything, except after the approval of the directors. Nakdimen testified that, as treasurer, he signed all the company's checks as long as there were funds; that these funds became exhausted, and on one occasion the laborers who had been at work at the well came to Fort Smith to get the money due them, and that Engles paid these bills at his suggestion by personal

checks drawn on his account at witness' bank, and he admitted that he knew current bills for operating expenses at the well were being paid by Engles with personal checks drawn on witness' bank. He explained his advice to Engles, however, by saying, "I told him to pay the bills he owed anybody, like I do everybody else; that was no special case; I tell anybody else to pay what they owe."

Various transfers were made of this stock, and appellant purchased $2,500 worth of the stock issued to Nakdimen, and a new certificate was issued to Nakdimen for the $2,500 worth of the stock which he did not sell. Engles also purchased stock from other stockholders, and there is no controversy now as to the amount of the stock owned by any stockholder.

It will be observed that this was no stock selling scheme, because the issuance of only $50,000 worth was authorized, and that entire amount was issued to the ten original promoters, and of this amount Engles owned originally one-tenth, and the additional stock which he owned was acquired by purchase from other stockholders.

The well was completed in November, 1916, that is, after going 3,240 feet it was concluded that it was not worth while to go further. Thereafter appellant undertook to call a meeting of the stockholders and directors to settle the affairs of the corporation, but was unable to do so. Formal notice of a meeting to be held April 5, 1917, was given, but only two directors, besides Engles, attended. These two constituted themselves an auditing committee, and ascertained the total cost of the well to have been $18,601.83, with salvage of $1,833.63, leaving net total cost of well $16,768.63. On this basis, the auditing committee, after crediting the payments made by the respective stockholders, determined there was due Engles the sum of $6,971.88, and a calculation is found in appellant's brief showing the proportionate part of that sum due by each of the other stockholders. Thereafter all of the stockholders, except appellees, paid Engles the sum found by the committee to be due by them;

and it is said this finding and report should be treated as an account stated. We do not think so, however, as no quorum attended this meeting.

It is not questioned that Engles has brought the proper suit to enforce his claim against the corporation if the testimony supports the allegations of his complaint. Here the corporation has ceased to perform its functions, and the testimony leaves no doubt about its insolvency. In the case of *Bank of Des Arc* v. *Moody,* 110 Ark. 43, we said: "A court of equity is the appropriate forum to enforce the right of the stockholder, who has paid, against one who is in default in the payment of his subscription, where the corporation has ceased to perform its functions. *Fletcher* v. *Bank of Lonoke,* 71 Ark. 1; 1 Cook on Corporations (7 ed.), sec. 204." See also, *Hatch* v. *Dana,* 101 U. S. 205, 25 L. Ed. 885; *Wait* v. *McKee,* 95 Ark. 124; *Ford Hardwood Lbr. Co.* v. *Clement,* 97 Ark. 522; *Holyfield* v. *Davis,* 139 Ark. 479; *Blood* v. *La Serena Land & Water Co.,* 89 Pac. 1090.

It appears, however, that the well cost even more than the sum found by the auditing committee. For instance, as has been stated, the corporation became involved in litigation over Davis' drilling outfit, in which appellees Nakdimen, Shaffer and McDonough, as sureties upon a bond executed in that litigation, were required to pay $217.70 each. This money, like that spent by Engles, was for the benefit of the company, and with the knowledge and consent of all the stockholders, and should, therefore, be taken into account in ascertaining the total debts due by the company. This may also be said of certain fees for services due McDonough as attorney for the company; and there are possibly other similar items. These matters were not passed upon by the court below, and do not appear to have been fully developed. These are equities which should be adjusted, and upon the remand of the cause, which is here ordered, the court may, if it is found proper, order a reference to a master to determine the total indebtedness of the company, and to prorate that among the stockholders in pro-

portion to the stock owned by them, after giving proper credits for sums expended for the company's benefit. It is so ordered.